And we'll hear argument next in NRW v. Bindra, 18-2275. Please proceed. May it please the Court. I'm Leslie Corwin. I represent the Plaintiff Appellant, NRW, Inc. We are here today because the District Court on not one but two separate occasions, prematurely and erroneously found, that NRW failed to plead the existence of an agreement between NRW and Defendant Respondents Mike Bindra and Laura DePalma, which provided NRW with a 50% equity ownership stake in the highly successful Electric Zoo Dance Music Festival, which is now an annual Labor Day weekend extravaganza at New York City's own Grand Rental Zone. I would look at the documents that you attached to that, to your pleading, couldn't it, in deciding at 12b-6, couldn't it? I mean, there were all sorts of things that were given, comments, things, e-mails, which were attached to the complaint, were they not? Yes, they were, Judge Gallop. And they can be looked at at 12b-6, Doug? I say to each one of these Honorable Judges, if you do this for me, because you've hit it right on the head, in all respect to the District Court, I think he got it wrong, I think he was too quick to rule with respect to this, but yes, it is all there in the complaint. If you look at paragraphs 28 through 35 of the second amended complaint, where he dismissed our cause of action for the ownership agreement, which is at A119-122, and if you look at Exhibits F, G, and H, which you will find at the record at A208-213, and then you find the couple of paragraphs which the District Court put into the record in connection with, quote-unquote, dismissing our second amended complaint, I just think he missed it completely, and was premature because if you understood the history of this agreement. There were many, many negotiations, but where do you find an offer and an acceptance with respect to the later deal as being a joint venture of 50%? Where do you find that? I mean, I see many discussions, I see many offers, I see many this, but I just, you know, I've been trying, looking at it, to see where I have this deal, which you obviously ought to have done, because it turned out that the first one was a failure, and the rest one was huge, but I don't... Huge, and there's a lot of damages that are involved here. Oh, yeah. I anticipated that you would ask me this, and again, I go back to the core paragraphs that I've told you about, the core documents, but if I can just take you through it, there was, you know, because of the history here, and remember, in the record here you had the plaintiff and the defendant had a history, they had been 50-50 partners in a nightclub here in New York City, there was a history here for the negotiations that went forward, which I say to you, it's not a pretty thing from a legal standpoint. There's not one document that I can look at and say, this is the agreement, but if you want... Well, if you take, can you take the package? I mean, you know, one of the things that I often tell my law clerks is, you know, when you look at briefs, and one side takes you blow by blow through the documents, and the other side doesn't, the side that's taking you through the documents probably has the better argument. Now, if you can take me through the documents and explain, I think it's what Judge Calabresi was asking, we all agree, as you just said, not a pretty picture, there's not one document that's signed, sealed, delivered, very neat, lays everything out. So why don't you tell me what the mess is and explain how you get to yes. On an agreement that is a 50-50 lifetime joint partnership going forward over the years. Right, and in all due respect to the district court, not a financing agreement that went awry. This was a partnership agreement, so let me do it for you. A partnership agreement not just for 2009, but a partnership agreement... Going forward... Right, so Judge Calabresi asked you, take us through the documents, show us where you get this. Let me do it. In an e-mail exchange starting on July 2nd and 3rd, 2009, between Perfetta Menges and Bindra confirming that they would move forward with the 50-50 deal. That's Exhibit G. What is this in the appendix? Because I have all these, Exhibit G is A210, right? Yes. Okay, so it's Exhibit G, which is, this is all at 1-9, at 2-0, let me have it right... Exhibit G is at A210. At A210, that's correct. If you read those two e-mails, Judge Lynch, starting in reverse order, it goes from July 2nd to July 3rd. Yes. And it says, let's, and Bindra says on July 3rd, let's move forward under the 50-50 deal you propose. The only thing we ask is that you exercise your option for Zoo 2010 one way or the other within 30 days after Zoo 2009. If there is an agreement for a joint venture of an indefinite length, what do you make of the fact that he has to exercise an option to be involved in 2010? The only one who had the option, and that was what the profits agreement was, which is Exhibit H, was that if my client decided that he wanted out and wanted an exit strategy, he had it, he had the sole right to do that. And that's Exhibit H. An option agreement for 2010 sounds to me like an option to opt in for 2010. No, no. It was to opt out, and exactly— What makes you say that? I'll tell you exactly, because if you read, if you go through and read those e-mails that I've said to you, and those sections of the complaint that were before the district court, what the only term that was left open after this e-mail exchange that I've just described for Justice Lynch was one point, what would happen at the end of 2009 after that festival? And what the parties had—and listen, they knew this was a startup. They knew this wasn't going to be profitable. Wait, wait, wait, wait. Okay, so now you're saying that then we have to look to understand this option at A219, right, which is the big letter agreement. Correct. But I thought it was your position that that big letter agreement itself was only about 2009. It was only about the one point that was still left open, which from what I read to you, which said, tell me what you want to do if we don't make money in 2009. You want in or you want out. Your exit strategy, you can stay in, and that's in fact what happened, Judge Lynch. My client stayed in. His money stayed in the venture in 2010. And just to complete the thing, if you look, and it's in the record, if you look at the financial statements, what 2009 and 2010, it says equity investment. He stayed in in 2010. He did not opt out. So what we're supposed to conclude is that there was an oral agreement, but maybe that's not it anymore. I thought that the thing you were now saying— There's an oral agreement which can be confirmed by e-mails. Nothing to have assigned to you. Mr. Corwin. Yes, sir. Question? Go ahead, Judge Lynch. I'm sorry. Then you answer. Okay, that there is an oral agreement that is not reduced to writing in any way, that they shook hands on a 50-50 joint venture indefinitely into the future with an option perhaps on the part of Mr. Ferdinand Mengis to drop out after 2009 and not participate anymore. That was never reduced to writing. But the same parties do a side letter that spells out this one little point that was left open in enormous detail in writing. And that's not the only agreement that the parties had. That's just a little clarification on something that never got written down. No, they don't sign that. They never sign that agreement. It's attached to an e-mail. And that's what the district—that's the whole problem here. That's what the district court—there's nothing signed. The district court said it right. E-mails, which set forth the material terms of an ownership agreement, can be considered signed writings. That's the problem that we have here. There is nothing signed except for e-mails and oral discussions, Judge Lynch. Fine. Thank you. Thank you very much. Thank you. Thank you. We deserve some time. Is that right? Please go ahead. Good morning, Your Honors. May it please the Court. My name is Sarah Matz, and I represent the defendants, appellees, that are still in this case. I think Your Honors hit the nail right on the head. Part of the problem here is that the— You're doing very good carpentry. I think it's about the fourth time today that we hit the nail right. Then you're doing good. On both sides of the same case. Although, what are we building? We'll call him Hammer from now on. The problem with the plaintiff's case here is that they're trying to allege several different things, but if you actually look at the facts they have alleged in both of their pleadings that are at issue in this case and the documents that are attached to the complaint, you will see that those documents not only do not support what they're saying but, in fact, contradict it. It's well-settled law that when documents that are attached to the complaint contradict the allegations, the district court is not required to presume those to be true. What law are we applying here? With respect . . . I believe that we're applying New York law at this point. The plaintiffs have made the motion under New York law to the extent that there was a choice of law provision. I believe it was waived. Although, as was briefed in the district court below, I don't think that the result changes between New York and Florida law. The district court said that the law of Florida and New York were the same. Yes. That isn't being contested before us today, is it? That's correct, Your Honor. We're not contesting that, and I don't believe the plaintiffs are either. Why isn't there at least an ambiguity in those documents? I mean, they aren't crystal clear, as Mr. Corwin concedes or argues. Why isn't there at least some . . . And there does seem to be, at least in the latest iteration, in the Fifth Amendment complaint, a kind of clear statement that we did have an oral agreement that was separate from whatever is being embodied here. That is true, although I'd like to correct a couple things. First, I think it's really important to know that they have pled and repeatedly argued in all the transcripts, and this is well cited in our brief, that the unsigned letter agreement, the August document, was accepted by that email. They are not saying that that agreement is not in full force and effect. Let me just ask. Yes. Is this argument that there are two separate agreements, which is what is being made now, was that argument ever made to the district court? It was not . . . I apologize. Or is that argument being made to us now for the first time? It was not made with respect to the Second Amendment complaint. One agreement was pled. They did plead two agreements in the Fifth Amendment complaint. The argument that they are making now has changed a little bit, but they did claim that there were two agreements when they moved for leave to file the Fifth Amendment complaint. Leave to amend. Yes, leave to amend. But, Your Honors, part of the problem here and what they haven't addressed in their papers is . . . And it does matter whether they're saying there's one agreement or two agreements, because if there's two agreements and they're claiming that there was a prior collateral oral agreement, they run into two problems. First is, there was no separate consideration. They are saying, under the letter agreement, we were required to pay you $500,000, and in exchange for that, we got 50 percent profits in 2009 only. And the letter agreement also provides that defendants owned all the rights related to the festival, that defendants had all the management rights related to the festival, and provided repayment terms, that they had to be repaid in a certain time frame, or, you know, out of profits from future festivals. They're also saying, and they say, we paid the $500,000 in the Fifth Amendment complaint. They plead, we paid the $500,000 in reliance upon the fact that they accepted that unsigned letter agreement in that August 6th email from Mr. Bindra, and that was the acceptance. Let me understand. What you are saying is that any additional agreement with respect to a joint venture was not anything that they were giving your clients anything additional for? That's correct, Your Honor, and they do not. And there is no allegation of any consideration of any sort for that? No. They say the consideration was the same $500,000. But doesn't the timing create a problem there? Because I think they're saying the oral agreement came before, so there was consideration in the form of the $500,000. Then this side thing comes up, which may or may not be binding. I don't know. So I agree that they've implied that, but, frankly, I think that it was one of the things we raised in our brief that I think the way that they implied that timing, if you look at the facts of their alleged complaint, is completely false. So the alleged oral agreement, well, first of all, I'm not sure when they're saying it was formed. They said there was a conversation in February. They argued that was negotiations. Then they said there's this e-mail in July, which, by the way, doesn't contain the word ownership and also doesn't even contain the promise to pay $500,000, both of which I would imagine are mere material terms of this agreement. They paid one payment at that point, part of the $500,000. Then the August 6th e-mail, the plaintiff himself e-mailed my client a draft and said, is this okay? And my client responded back, yes, looks great. Let me know what I need to do to sign and had a couple of typo corrections. And the judge found that was a sufficient confirmation and acceptance of that August unsigned letter agreement. Then they wired the second part of the money. And they have alleged in paragraph 114 of their fifth amended complaint that that second payment was sent specifically in reliance upon Mr. Bindra's e-mail saying, you know, they were interpreting he was saying he's accepting the unsigned letter agreement. So, no, there's not two considerations, and I don't think the timing presents a problem. There is a portion of their brief where they kind of say, oh, there was consideration in March or April. I don't remember the exact page that's on, but that's not actually what the facts bear out. I think it's kind of an attempt to create some confusion about when certain things happened. The next thing you were going to say is there's also a statute of frauds problem? There's a statute of frauds problem and there's a parole evidence problem. The unsigned letter agreement, which they are claiming is a valid and enforceable agreement, contains a merger clause that says that the merger clause says that it bars, that it contains the entire agreement between the party and that any prior contracts are, I apologize, I don't have the exact language in front of me, but, you know, contains a fully integrated merger clause. That is all fine with respect to anything prior. It doesn't mean that you couldn't enter into a joint venture after, but at that point you run into the consideration problem that if it is, if this second agreement is made after the signing of a merger clause, which one could do, but then what's the consideration for that? Yes, Your Honor, but they're not claiming that the joint venture agreement was created after. There are only two allegations that I don't think that they even constitute offer and acceptance. I'm not conceding that because our position is they do not. But the only things they even point to are a February conversation, which, again, they argued extensively, that was just negotiations, and then this July email where they said, where Mr. Binder said, let's move forward with the 50-50 offer, but we want you to exercise your option. I also note it is extremely important to know that also at that time, at the time that July email was sent, there had been a prior draft of the August unsigned letter that was sent on June 17th, and that is in our special appendix. It was referred to by them in the pleadings. They referred to the earlier drafts of the agreements, and we have submitted, and they have not contested that it can be considered by the court. The reason why that is extremely important is because the June 17th draft actually did contain an option. It contained an option. Where is that? It's special appendix 85, and if you look at paragraph 6, they had a right to invest, and this was taken out of the later document, I want to be clear, but it said they had a right to invest in Electric Zoo Festival 2010, and the first right shall expire on January 1, 2010. Tell me the page. It takes a while to find the book when there are so many volumes. I apologize, Your Honor. Supplemental appendix. Yes. 85. 85, and the paragraph I'm looking at is actually on page 86. It's paragraph 6. So if you look at this, this said that the option that allowed them to reinvest at the same level, they would have had to put more money in. That's what was being contemplated here. It had to be exercised by January 1, 2010. Then two weeks later, Mr. Bindra sends an email that is talking about a quote-unquote 50-50 deal and wanting the option exercised in a shorter time frame. So I think it's very clear, and I don't think that there's any factual ambiguity here. When you look at the documents, even according to reasonable inferences, not unreasonable inferences, I think it's very clear that the parties were negotiating this unsigned letter agreement at the time, and those July emails were discussing that, and the court properly ruled that the August draft accepted their allegation that it was agreed to by an email responding saying, thanks, this looks great in August, and the court properly interpreted what that contract meant and properly found that that did not mean that they had an ownership interest. The basic argument is that the district court has gone through every one of these in order and has ruled them exactly the way you described. Yes, Your Honor, and I will point out the district court did an extensive legal analysis of what the terms of the contract meant in its September 10 opinion, which they have not appealed. So from our perspective, that's the law of the case, what the contract provides for, the August 6 contract. I taught the district judge torts. I did not teach him contracts, so he may well have made mistakes. Thank you very much. Thank you, Your Honor. Mr. Fogarty. The consideration wasn't the $500,000. It's just nonsensical. My client would not have invested $500,000 just to be in this startup venture. The consideration was the profits. And again, as you go back to where I was, if you go back to these e-mails. Explain to me. Assume the $500,000 had already been paid. I mean, you know, there's our question. But what was the consideration for an oral agreement to be a joint venture in any further developments of this festival? What did your client give to the other side in exchange for getting rights up to 50% of the profits? It gave the money that the defendants didn't have to go rent out Randall's Island, to hire artists to go do this thing, and to start this venture and get it off the ground. Without that $500,000. That had already been paid. No, but again, let's talk about when it was paid. It was not paid back initially after 2009. If that had been the case, they may have a good argument. But they don't, and it doesn't because the documents don't lie. And again, I go through what I've asked you to do. My client's money stayed in Electric Zoo Festival in 2010. They had the use of those funds. They needed it because 2009 lost money. They always anticipated that would happen. That's what happens in these start-up things. But I'm telling you, there never would have been an Electric Zoo Festival without my client's $500,000. Those defendants didn't have a penny to do a thing with this. They had a concept, but they needed the money. Add to that the fact that they had this long-standing friendship. They were great friends. That's why they did this thing. That's why it's so sloppy. Listen, believe me, I wish it was easier for all of us here today. But it's not. This is not an easy argument for me. But you know what? Aristotle says sometimes there has to be corrective justice. Now's the time to do it. This thing is wrong. They knew what was happening. They saw what happened in 2010 while my client's money was still in this thing. And by that time, they came out with a strategy. They schemed to try to get my people out of this thing. The record shows they offer them 20 percent. They offer them 10 percent. They offer them $300,000. Why? They knew what was coming on down the road. Listen, I don't understand electric dance music. Maybe my grandkids will describe it to me. But the thing became such a big success that in 2014, they sell it to SFX for $45 million. That's what they knew what was going on. And that's what you tell this honorable court, that if you at least got to give my client. Out of curiosity, did anybody ever get the $45 million? Yeah, they got a big portion of it, and then they went into bankruptcy, which stayed these proceedings, too. Where the money is, that's another thing. All I want is a day in court to let a jury decide whether these documents say what my clients say they are. That's the justice I need. Thank you. Thank you. Court is adjourned.